UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————————

DIMITRIOS N. KARABINAS,

              Plaintiff,

      -vs-

CAROLYN COLVIN, Acting Commissioner
of Social Security,

              Defendant.

———————————————————————————

**DECISION and ORDER
No. 6:12-CV-6578(MAT)**

## I.  Introduction

Dimitrios N. Karabinas ("Plaintiff" or "Karabinas"), represented by counsel, brings this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.  Procedural History

On January 22, 2009, Plaintiff filed an application for DIB alleging disability beginning November 4, 2008. See T.123-29.[1]

---

[1]

    Numerals preceded by "T." refer to pages from the transcript of the administrative record, submitted by Defendant as a separately bound exhibit in this proceeding.

After the claim was denied, Plaintiff requested a hearing. Plaintiff appeared with counsel and testified at a hearing held on June 4, 2010 before Administrative Law Judge Brian Kane ("the ALJ"), T.22-58, who issued an unfavorable decision dated August 26, 2010, T.10-21. Plaintiff requested review by the Appeals Council, which was denied on August 28, 2012. T.1-4. Plaintiff timely commenced suit in district court.

During the pendency of this case, Plaintiff filed a new DIB application. By hearing decision dated January 7, 2013, the ALJ granted benefits to Plaintiff commencing August 27, 2010 (the day after the decision presently on appeal). Thus, the relevant period at issue here is November 4, 2008 (the alleged onset date), through August 26, 2010.

## III. Summary of the Administrative Record

### A.   Plaintiff's Medical History

Plaintiff injured his neck at work on November 4, 2008, after he attempted to right a heavy barrel that was tipping over. T.319. Physical symptoms at the time were left cervical stiffness and pain down his left arm. An MRI of his cervical spine taken November 5, 2008, showed moderate to severe neural foraminal narrowing, and mild left foraminal narrowing at C5-C6. At C6-C7, there was mild to moderate left neural foraminal narrowing, and mild disc protrusion at this level. T.302.

-2-

James T. Maxwell, M.D. evaluated Plaintiff on November 8, 2008. Plaintiff sat and walked normally. Palpation of the neck was normal, his cranial nerves were normal, and muscle strength was full in both arms. Neurological examination was normal, and that Plaintiff's MRI was "not very impressive". Dr. Maxwell noted that simple chiropractic treatment was keeping Plaintiff's pain down, and recommended that Plaintiff continue this conservative treatment. T.317.

On November 12, 2008, Plaintiff's primary care physician, Dr. Eman Wahba, noted that Plaintiff was feeling better; he was able to rotate his neck, and had no arm weakness. Hand grip was intact and left-shoulder range of motion was full. On December 1, 2008, Dr. Wahba, released him to work, but limited him to half-days. T.316, 318.

On December 8, 2008, orthopedist Dr. E. Robert Wilson evaluated Plaintiff, who complained of continued pain down his left upper extremity following his November 2008 injury. On physical examination, Plaintiff's gait was normal. He moved around the examining room easily, and got on and off the examining table without difficulty. Plaintiff did not move his neck more than a few degrees in any direction. He flexed his shoulders to 170 degrees, and external rotation was 40 degrees. Dr. Wilson could not elicit biceps or brachioradialis reflexes on the left side; however, Plaintiff's reflexes were normal on the right. Sensation and muscle

power were intact in the upper extremities. Plaintiff could walk on his heels and toes, and could squat 1/3 of the normal range. Dr. Wilson diagnosed recurrent left C6-C7 disc herniation, with a moderate to marked partial temporary disability of the neck and left upper extremity. T.294-97.

On December 17, 2008, Dr. Wahba noted that Plaintiff had no weakness, but had numbness in his fingers on the left side. Plaintiff's left shoulder was not swollen, and his range of motion was improving. He had no motor deficit, and his hand grip was intact. T.315.

On January 9, 2009, Dr. Wahba noted that Plaintiff could not return to work, because his job required physical and manual labor. According to Dr. Wahba, he had numbness in the fourth and fifth fingers of his left hand. He walked and sat normally, and got on the examination table without assistance. He had no gait abnormality, his cranial nerves were intact, and there was no atrophy in the left shoulder. Plaintiff's muscle tone was intact. Dr. Wahba opined that Plaintiff would be "disabled" until January 16, 2009. T.309.

On January 16, 2009, Dr. Wahba noted that Plaintiff's neck was mildly to moderately stiff but range of motion was intact. Dr. Wahba found that Plaintiff could not remain in his job, which required lifting, heavy pushing, and bending. Therefore, she found that Plaintiff had a total temporary disability. T.308.

Plaintiff saw consultative physician Dr. Sandra Boehlert on March 6, 2009, and reported continuous headaches. He noted the use of Vicodin for his pain, but commented that Vicodin also seemed to cause his headaches. When Plaintiff's wife had taken their children to Greece for several months, Plaintiff was able to cook, clean, do laundry, and shop on his own. However, his left hand went numb with such chores. Plaintiff showered and dressed daily, watched television, listened to the radio, read books, socialized with friends, called his friends, and talked to his family. He was unable to engage in athletic pursuits. Plaintiff's gait was normal, and he could walk on his heels and toes without difficulty. Plaintiff used no assistive devices, and needed no help getting on and off the examination table. He was able to rise from his chair without difficulty. T.375-76.

Cervical spine extension was limited to 30 degrees, but flexion was full. Rotation was limited to 40 degrees on the left and to 70 degrees on the right. Lateral flexion was limited to 40 degrees bilaterally. Plaintiff moved his neck very slowly. No abnormalities were evidence in the thoracic or lumbar spines. Although Plaintiff's left arm had full flexion, it started tingling and caused his hand to go numb. Upon standing, feeling returned to his left hand. Straight leg raising essentially was normal, but while sitting, at 90 degrees, Plaintiff reported left cervical pain. Plaintiff's left shoulder was limited in abduction to 120

degrees, but was normal on the right. His left shoulder had full adduction, as well as internal and external rotation. Range of motion was full in the shoulders, elbows, forearms, and wrists. Muscle strength was full in the upper and lower extremities. However, Plaintiff had tenderness in the left-side shoulder, scapula, cervical spine, and paracervical spinal muscles; in the mid-thoracic spine; and in the paraspinal muscles. Deep tendon reflexes were normal in the upper and lower extremities. Hand and finger dexterity were intact, and grip strength was full bilaterally. Dr. Boehlert assessed a moderate limitation to any use of the left arm for heavy exertion; and a moderate limitation to neck rotation on a repetitive or continuous basis which could resolve in six to nine months. Accordingly, Dr. Boehlert recommended a follow-up examination in one year's time. She did not find that Plaintiff's limitation was chronic, continuous, or permanent. T.377-38.

On April 24, 2009, Dr. Wahba noted that Plaintiff's pain had increased. Although he did not have weakness in the arm, there was pain when he turned his neck to the right side. Plaintiff took Vicodin only as needed, and had no fever, headaches, or neck stiffness. Plaintiff was in mild to moderate distress, and his neck was a little stiff to the left. There was supra-spinatous muscle tenderness, and his left shoulder was non-swollen. There was no

muscle atrophy, hand grip was normal, and muscle tone was intact. T.425.

Plaintiff saw Dr. Wahba on June 26, 2009, and reported pain but no weakness. Plaintiff's his neck and shoulder were somewhat on the left side. His left shoulder was non-swollen, there was no muscle atrophy, and range of motion was within normal limits. Plaintiff's grip strength was intact. T.468. Dr. Wahba diagnosed cervicalgia. T.472. Plaintiff was "100%" temporarily impaired, and his restrictions would last an unknown amount of time. T.473. Plaintiff was precluded from returning to work because, in Dr. Wahba's opinion, he was "totally disabled." T.473.

On July 24, 2009, Plaintiff reported a flare-up of neck and left shoulder pain. T.467. There was mild tenderness of the left paracervical muscles, but his left shoulder was nonswollen, and there was no weakness. Dr. Wahba saw no significant changes. On August 24, 2009, Dr. Wahba noted that Plaintiff had a headache and his physical examination was largely unchanged. T.469. Dr. Wahba assessed that Plaintiff was still "totally disabled." T.476-77.

On October 8, 2009, an x-ray of Plaintiff's lumbrosacal spine revealed L5 spondylolysis with first degree spondylolisthesis, moderate disc space narrowing at L5-S1, and a 4-millimeter pelvic tilt. T.481.

On October 21, 2009, Plaintiff reported increased pain due to cold weather. T.470. Examination showed no significant changes. On

December 1, 2009, Plaintiff reported pain and a headache after having chiropractic work. Id. Physical examination was unremarkable. Dr. Wahba assessed that Plaintiff was still "totally disabled." T.483-84. On January 14, 2010, Dr. Wahba issued a finding that Plaintiff remained "totally disabled." T.485-86.

On January 28, 2010, Plaintiff saw Nurse Practitioner Mary Maxwell ("NP Maxwell"), on behalf of Dr. Maxwell. T.453. Plaintiff stated that he could not work due to left neck and left arm pain, but denied any significant right arm pain, or troubles with his legs. Plaintiff's gait was smooth and non-spastic. Rapid alternating movements of his hands and feet were smooth and not spastic. He had no motor weakness of his arms, and his deep tendon reflexes were symmetrically sluggish. Muscle strength was 5/5 in his deltoids, biceps, triceps, wrists, and fingers. In an addendum, NP Maxwell noted that after talking to Dr. Maxwell, they did not believe there was any surgical remedy to Plaintiff's pain. T.453-54. Dr. Maxwell, apparently based upon NP Maxwell's examination, opined that Plaintiff's level of disability was permanent, moderate, and partial. T.454. Dr. Maxwell did not believe Plaintiff was capable of any heavy physical work, especially if it involved repetitive or heavy lifting, pushing, or pulling. T.454. Dr. Maxwell did believe that Plaintiff could do light duty work, and had a moderate 50% disability in that regard. T.454.

On March 30, 2010, Dr. Wahba assessed that Plaintiff was "totally disabled." T.487-88. Treatment notes from that day reflect that Plaintiff had a neck and left shoulder ache, which was helped some by chiropractic treatment. Plaintiff had mild tenderness of the left paracervical muscles. T.491.

On May 3, 2010, Dr. Kosmicki, Plaintiff's chiropractor, wrote a letter to Plaintiff's counsel, see T.458-59, reporting that cervical chiropractic manipulation provided Plaintiff with 3 to 5 hours of pain relief. T.458. Driving and walking provoked Plaintiff's pain. Plaintiff took Vicodin sparingly to avoid its addictive potential. Plaintiff also reported constant, intermittent headaches that he attributed to stress in his daily living.

Physical examination revealed that range of motion of Plaintiff's cervical spine was limited to 20 degrees of flexion, 25 degrees of extension, and 45 degrees of left rotation. Right rotation was 70 degrees, left lateral flexion was 10 degrees, and right lateral flexion was 15 degrees. Plaintiff's right shoulder was normal. Plaintiff's left shoulder was limited, with a 20 degrees reduction in subscapular pain, ten degree reduction in extension, 40 degree reduction in abduction with tingling in his upper arm, and normal adduction. T.459. Plaintiff's left shoulder was also reduced 10 degrees in external rotation. Sensation was decreased along the left C5, C6, and T1 dermatomes, and increased on the left C7 and C8 dermatomes. T.459. Muscle strength was

reduced to 4 out of 5 on the left at C7, C8, and T1. Reflexes were normal at +2 bilaterally. T.459.

Dr. Kosmicki noted that he had treated Plaintiff for nearly 2 years and, in his opinion, Plaintiff had a moderate permanent partial disability. T.459. Given the progression of Plaintiff's condition, Dr. Kosmicki found that Plaintiff should not perform any heavy physical labor or do repetitive motions. T.459. Plaintiff also needed to avoid prolonged overhead activities, and lifting, carrying, pushing, or pulling greater than 30 pounds. T.459. Dr. Kosmicki thought that Plaintiff was capable of "light duty" work with these restrictions. T.459.

On May 5, 2010, Dr. Kosmicki completed a Physical Residual Functional Capacity Questionnaire on Plaintiff's behalf. See T.463-64. Per 8-hour work-day, Plaintiff could sit up to 6 hours, and stand or walk up to 2 hours. T.463. He could frequently lift up to 10 pounds, and occasionally lift up to 25 pounds. Plaintiff could frequently carry up to 5 pounds, and occasionally carry up to 20 pounds. Plaintiff could repetitively grasp with both hands, but could not use his left hand for repetitive pushing, pulling, or fine manipulation.  Plaintiff could use both legs repetitively. He could frequently bend, squat, and crawl; but he could never climb or reach; could not be around unprotected heights; was moderately limited in exposure to marked temperature and humidity changes; and mildly limited in being around moving machinery, and mildly limited

-10-

in exposure to respiratory irritants. T.463. Plaintiff's pain and medications would occasionally impair or preclude performance of even simple work, and he would need to lie down about 2 hours per day to relieve pain as well as due to fatigue. T.464. Exacerbations of Plaintiff's pain made it impossible to function in a work setting because they would force him to miss work 4 or more days per month. T.464. Dr. Kosmicki stated that Plaintiff was "disabled" from full-time competitive employment, but could work two to three hours per day. T.464.

On May 11, 2010, Dr. Wahba completed a Doctor's Progress Report for the Worker's Compensation Board and found that Plaintiff was totally disabled. T.489-90. On May 28, 2010, Dr. Wahba wrote to Plaintiff's counsel, stating that under New York State Workers' Compensation Board Medical Guidelines, Plaintiff had a permanent-partial disability of approximately 50%. T.492.

On July 19, 2010, NP Maxwell, on behalf of Dr. Maxwell, wrote to Dr. Wahba, reiterating Dr. Maxwell's opinion that Plaintiff had "a 50% permanent, moderate, partial disability regarding work[.]" T.495. Heavy physical work was not recommended, and Plaintiff "should avoid heaving [sic] lifting, pushing, or pulling." Id. NP Maxwell noted that Dr. Maxwell adhered to his opinion in his January 28, 2010 letter (T.454) that there was nothing that could be done to eradicate Plaintiff's ongoing left neck and arm pain. Consequently, Plaintiff's level of disability was permanent and

partial from heavy work, but he had a moderate 50% permanent disability from light work. T.454.

**B.   Non-Medical Evidence**

Plaintiff testified that chiropractic treatment gave him 4 to 6 hours of pain relief. T.31. Plaintiff was able to drive. When Plaintiff was a restaurant manager, he stood all day, and supervised approximately six people. T.36. As a school custodian, he also stood all day, cleaning bathrooms and classrooms. T.37. The heaviest weight he had to lift was over 50 pounds. T.37. Plaintiff reported constant pain in his neck, as well as numbness in his left hand, forearm, and fingers. T.42. He had numbness in his hand 3 to 4 times per day, from sitting too long, walking, or turning his head. T.42-43. He also experienced muscle spasms in his neck, and daily headaches. T.43. Plaintiff could stand for 10 to 15 minutes at a time before needing to switch positions. T.45. Plaintiff also had to lie down for 10 to 15 minutes at a time. Id. For his anxiety, Plaintiff took Lexapro. T.50-51. His pain caused trouble concentrating. T.51.

The ALJ called a vocational expert ("VE"), who classified Plaintiff's past relevant work as a cook as medium in exertion and skilled. His past work as a restaurant manager was light and skilled, although he performed it at the medium level of exertion. T.53. As a custodian, Plaintiff's work was heavy and unskilled. Id. The ALJ then posed a hypothetical question to the VE, asking

whether someone of Plaintiff's age, education, and work experience, with the ability to perform light work not involving more than occasional overhead activities, less than occasional repetitive motions with the upper extremities, and less than occasional reaching, handling and fingering would be able to perform Plaintiff's past relevant work. T.53-54. The VE replied that such a person would not, but could perform the work of surveillance system monitor, which is unskilled and sedentary in exertion. T.54. There were 16,763 such jobs nationally, and 63 in the Finger Lakes region. T.55. If the hypothetical person were capable of occasional reaching and fingering, but still could not reach overhead, he could not perform Plaintiff's past relevant work but could perform the jobs of counter clerk, which is light in exertion and unskilled; and furniture rental clerk, which is also light and unskilled. T.55-56. There were 110,821 such jobs in the national economy and 322 in the Finger Lakes region. T.56. Such a person could also perform the light, unskilled job of auto dealer accounts investigator, of which there were 56,855 such jobs nationally, and 165 in the Finger Lakes region. T.56.

In response to Plaintiff's attorney's hypothetical involving a person who had to lie down for 2 hours per 8-hour day, the VE testified that such a person would not be able to perform any competitive work. T.56-57. Nor could the hypothetical person perform any work if he were to be off-task 25% or more of the time.

T.57. In addition, if the hypothetical person were to miss more than 4 days of work per month, he could not perform any competitive work. T.57.

## IV.  General Legal Principles

### A.    Eligibility Standards for DIB

In order to be entitled to DIB, a claimant must demonstrate that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment, or combination of impairments, which has lasted, or can be expected to last, for a continuous period of at least 12 months. 42 U.S.C. §§ 423(d)(1)(A). A disabling physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). DIB are unavailable unless the claimant was disabled at a time when he met the insured status requirements of 42 U.S.C. § 423(c), 20 C.F.R. §§ 404.130, 404.315(a).

The sequential evaluation for adjudicating disability claims is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The claimant bears the burden of proof at steps 1 through 4, at which point there is a limited burden-shift to the Commissioner to demonstrate that there is other work in the national economy that the claimant can perform. Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000).

B.    **Standard of Review**

Under the Act, the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, a court will set aside the "decision only where it is based upon legal error or is not supported by substantial evidence." Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence has been defined "more than a scintilla[,]" that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In reviewing the ALJ's decision in light of the record, the district court does not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Jones v. Sullivan, 949 F.2d 57 (2d Cir. 1991).

A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. Ferrari v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

## V.    The ALJ's Decision

At step 1, the ALJ found that Plaintiff had not worked after his alleged onset date of November 4, 2008. T.15. At step 2, the ALJ found that Plaintiff had one severe impairment, namely, cervical disc problems. T.15. At step 3, the ALJ considered Listing 1.02 (Major Dysfunction of a Joint) and Listing 1.04 (Disorders of the Spine), and determined that Plaintiff's severe impairment did not meet or medically equal either of these listed impairments. T.15. The ALJ noted that although there was evidence of cervical disc herniation, there was no evidence of an inability to perform fine and gross movements effectively. T.15. Accordingly, Plaintiff did not meet or medically equal a listed impairment. Further, the ALJ noted that although there was evidence of disc space narrowing and spondylolysis, there was no evidence of nerve root compression, spinal arachnoiditis, spinal stenosis causing pseudoclaudication, or the inability to ambulate effectively. T.15.

At step 4, with regard to Plaintiff's residual functional capacity ("RFC"), the ALJ found that Plaintiff had the ability to perform work classified as "light" in exertional level, but with several additional limitations: only occasional overhead activity; no repetitive motion of the upper extremities; and only occasional reaching, handling, and fingering. T.16-20.

At step 5, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in

significant numbers in the national economy that he can perform. The ALJ relied on the VE's hearing testimony, which he found consistent with the Dictionary of Occupational Titles. T.20-21.

## VI.  Plaintiff's Contentions

Plaintiff argues that the ALJ's RFC assessment was flawed in the following ways: the ALJ failed to make accommodations for Plaintiff's moderate difficulties in maintaining concentration, persistent, or pace; the ALJ failed to perform an assessment of his work-related abilities on a function-by-function basis; and the ALJ improperly weighed the treating sources' medical opinions. Plaintiff also contends that the ALJ's credibility assessment was the product of legal error. Finally, Plaintiff asserts that the VE's testimony cannot provide substantial evidence to support a finding of non-disability because the RFC forming the basis of the hypothetical posited to the VE was incomplete. The Court addresses these contentions in turn below.

### A.    Erroneous RFC Assessment

RFC is defined as "what an individual can still do despite his or her limitations." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.

Id. A "regular and continuing basis" is a work schedule consisting of, or equivalent to, 5 consecutive 8-hour days. Id.

In determining an individual's RFC, the ALJ considers the claimant's physical abilities; mental abilities; and symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a). RFC "must be established by demonstrating by substantial evidence each of the criteria of the physical requirements in the regulations." LaPorta v. Bowen, 737 F. Supp. 180, 183 (N.D.N.Y. 1990) (citing Benko v. Schweider, 551 F. Supp. 698, 705 (D. N.H. 1982) ("There is no presumption of sitting ability available to the Secretary; it must be established by substantial evidence.") (citing 20 C.F.R. § 416.967).

As noted above, the ALJ concluded that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he was limited to "only occasional overhead activity; no repetitive motion of the upper extremities; and [only] occasional reaching, handling and fingering." T.16.

### 1. Failure to Make Accommodations for Difficulties in Maintaining Concentration, Persistence or Pace

In the discussion of his RFC assessment at step 4, see T.16-20, the ALJ noted that Plaintiff testified that he was depressed and on antidepressant medication, and that the consultative examiner had diagnosed Plaintiff with adjustment order with stress

response, see T.375-79. However, the ALJ found that there was "insufficient evidence to support a finding that the claimant has any severe mental impairment." T.19. Nevertheless, "after considering all of the evidence," the ALJ found that Plaintiff does have "mild limitations in activities of daily living, mild limitations in social functioning, and moderate difficulties in maintaining concentration, persistence or pace. . . ." T.19.   As Plaintiff correctly notes, the ALJ did not incorporate any of these "moderate limitations" into his RFC assessment or any of his hypotheticals to the VE. Plaintiff argues that ALJ's failure to do so was error. Dkt #18-1 at 7 (citing Hudson v. Commissioner of Soc. Sec., 5:10-CV-300, 2011 WL 5983342 (D. Vt. Nov. 2, 2011) (collecting cases)).

Pursuant to SSR 96-8p, "the limitations identified in the 'paragraph B' and 'paragraph C' criteria" of the adult mental disorders listings in 12.00 of the Listing of Impairments, which the ALJ apparently was referencing in his step 4 discussion of Plaintiff's adjustment disorder, "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4 (S.S.A. Jul. 2, 1996). The ALJ, however, did not conduct any analysis of how Plaintiff's mental limitations affect his ability to function in a work-setting at step 3.

SSR 96-8p further states that "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment [than that made at step 3] by itemizing various functions contained in the broad categories found in paragraphs B and C. . . ." Id. When making findings about a claimant's RFC, an ALJ may not avoid conducting the "detailed assessment" referenced in SSR 96-p "by merely indicating that the claimant can perform simple, unskilled work." Thompson v. Astrue, No. 10-CV-6576 CJS, 2012 WL 2175781, at *13 (W.D.N.Y. May 30, 2012) (citing Hudson v. Commissioner of Social Sec., Civil Action No. 5:10-CV-300, 2011 WL 5983342, at *9-10 (D. Vt. Nov. 2, 2011) (holding that ALJ erred when, in posing hypothetical to VE when, merely indicated that the claimant could perform "routine and repetitive tasks with brief and superficial contact with the general public, coworkers, and supervisors" and did not indicate that claimant had specific limitations with regard to concentration, persistence or pace) (citing Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009) ("The Commissioner asserts that the ALJ accounted for [the plaintiff's] limitations of concentration, persistence, and pace by restricting the inquiry to simple, routine tasks that do not require constant interactions with coworkers or the general public. We have rejected the very same contention before."); Winschel v. Commissioner of Social Sec., 631 F.3d 1176, 1180-1181 (11th Cir. 2011) (holding that limiting claimant to

-20-

simple, routine tasks or to unskilled work would not, standing alone, typically suffice to account for a claimant's moderate limitations in concentration, persistence, or pace); other citations omitted). Here, the ALJ did not even limit Plaintiff to simple, routine, or unskilled work, much less make a "detailed assessment," SSR 96-8p, 1996 WL 374184 at *4, regarding his limitations in concentration, persistence, and pace. Nor did the ALJ incorporate in his hypotheticals any of the limitations he found at step 4 with regard to Plaintiff's ability to concentrate, persist, and maintain pace. The ALJ thus gave no consideration to the mental limitations he identified at step 3 when he was making the RFC determination. See Thompson v. Astrue, 2012 WL 2175781, at *13 (remanding for further administrative proceedings).

### 2.   Failure to Perform Function-by-Function Analysis

Plaintiff assigns error to the ALJ's failure to make a function-by-function assessment of his ability to perform the physical requirements of light-duty work. The Act's regulations require that the ALJ include in his RFC assessment a "function-by-function analysis of the claimant's functional limitations or restrictions and an assessment of the claimant's work-related abilities on a function-by-function basis." Zurenda v. Astrue, No. 11-CV-1114 (MAD/VEB), 2013 WL 1183035, at *4 (N.D.N.Y. Mar. 1, 2013), report and recommendation adopted, 2013 WL 1182998 (N.D.N.Y. Mar. 21, 2013). In other words, the ALJ "must make a

function-by-function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch." Id. (citing 20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a); Martone v. Apfel, 70 F. Supp.2d 145, 150 (N.D.N.Y. 1999)).

Several circuit courts of appeal have concluded that a function-by-function analysis "is desirable, but not an absolute requirement if the rationale for the ALJ's RFC assessment can be readily discerned." Zurenda, 2013 WL 1883035, at *5 (collecting cases). The Second Circuit has not yet determined whether non-compliance with SSR 96-8p is per se grounds for remand, but it appears that the majority of district courts in the Circuit have found that this is such an error. See, e.g., Wood v. Commissioner of Social Sec., No. 06-CV-157, 2009 WL 1362971, at *6 (N.D.N.Y. May 14, 2009) (collecting cases); McMullen v. Astrue, 05-CV-1484, 2008 WL 3884359, at *6 (N.D.N.Y. Aug. 18, 2008); Hogan v. Astrue, 491 F. Supp.2d 347, 354 (W.D.N.Y. 2007) (Larimer, D.J.); Matejka v. Barnhart, 386 F. Supp.2d 198, 208 (W.D.N.Y. 2005) (Siragusa, D.J.) ("The ALJ's decision did not address the plaintiff's ability to sit, stand, or walk . . . Since the ALJ failed to make a function-by-function analysis of plaintiff's RFC, his determination that she had the RFC for sedentary work is not supported by substantial evidence."); Brown v. Barnhart, No. 01-CV-2962, 2002 WL 603044, at *5-7 (E.D.N.Y. Apr. 15, 2002) ("[B]ecause the ALJ did

-22-

not properly apply the legal standard in Social Security Ruling 96-8p for assessing residual functional capacity, I cannot properly conclude that his finding that the claimant retained the residual functional capacity to do her past work was supported by substantial evidence.").

The Court finds the cases cited above persuasive, and agrees with Plaintiff that the ALJ's RFC assessment erroneously fails to provide a "function-by-function assessment" of his "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis[,]" SSR 96-8p. That is, the ALJ did not directly address Plaintiff's ability to sit, stand, walk, lift, or carry, and only indirectly addressed Plaintiff's ability to push or pull. See Matejka, 383 F. Supp.2d at 208 (citing Myers v. Apfel, 238 F.3d 617, 620, 621 (5th Cir. 2001) ("Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. 'Each function must be considered separately.'") (quoting SSR 96-8p, 1996 WL 374184, at *1); Murphy v. Barnhart, No. 00 Civ.9621(JSR)(FM), 2003 WL 470572, at *9 (S.D.N.Y. Jan. 21, 2003)).

### 3.   Evaluation of Medical Opinion Evidence

As Plaintiff notes, the ALJ accorded "great weight" to the May 3, 2010, opinion by Dr. Kosmicki, Plaintiff's chiropractor, based in part on the length of their treating relationship. T.19. However, the ALJ gave little weight to Dr. Kosmicki's RFC

assessment dated May 5, 2010, finding that it was contradictory to his May 3rd statement. T.19. However, reading the two opinions in tandem makes clear that the May 5th report regarding Plaintiff's limitations on concentration, persistence, and pace, as well as his need for rest-breaks, are based on specific findings in the May 3rd letter concerning Plaintiff's pain, other symptoms, and side-effects from his pain medication. Thus, the ALJ erred in rejecting the May 5th opinion by Dr. Kosmicki as inconsistent with his May 3rd letter.

The Court recognizes that Dr. Kosmicki stated in his May 3rd letter that he believed Plaintiff could engage in "light duty" work. However, Dr. Kosmicki also stated that Plaintiff had a moderate permanent partial disability. These terms are used in connection with determining disability under New York State's Workers Compensation Law. And, as the ALJ noted, the definition of disability under the Workers Compensation Law is different than that under the Social Security Act. Furthermore, it is apparent from the context of the letter that Dr. Kosmicki was only considering the *exertional* requirements of "light duty" work (which, in any event, is not defined his letter). Dr. Kosmicki's May 3rd letter did not address Plaintiff's ability to fulfill the *durational* requirements of full-time, competitive work at the "light" exertional level. Instead, these requirements are addressed in Dr. Kosmicki's May 5th report, and are consistent with

Dr. Kosmicki's specific findings in his May 3rd letter as to the limitations imposed by Plaintiff's pain and the side-effects of his medications. In particular, Dr. Kosmicki explained in his May 5th report that Plaintiff's pain and medication side-effects would occasionally impair or preclude his ability to perform even simple work tasks, and he would need to lie down during the day for approximately 2 hours to relieve pain and fatigue arising from his cervicalgia and the side-effects from his medications. T.464. These conclusions are supported by the narrative portion of Dr. Kosmicki's May 3rd letter regarding Plaintiff's pain and side-effects from his pain medications, Plaintiff's testimony, and the medical record as a whole.

The limitations outlined in Dr. Kosmicki's May 5th report are significant because, as Plaintiff notes, RFC is premised on a individual's ability to perform sustained work activities in an ordinary employment setting on a regular and continuing basis, that is, 8 hours a day, 5 days a week, or an equivalent schedule. See 20 C.F.R. § 1545(b), (c); SSR 96-8p. Because RFC measures the *most* an individual can do despite his impairments, an RFC assessment necessarily must take into consideration the claimant's physical and mental limitations, symptoms (including pain) and all other relevant evidence in the case record. See id.; Faherty v. Astrue, No. 11-CV-02476(DLI), 2013 WL 1290953, at *14 (E.D.N.Y. Mar. 28, 2013) (In determining RFC, "'[t]he ALJ must also discuss the

claimant's ability to perform these functions in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each *work-related activity* the individual can perform based on the evidence available in the case record.'") (quoting Hilsdorf v. Commissioner of Social Sec., 724 F. Supp.2d 330, 348–49 (E.D.N.Y. 2010) (internal citations omitted) (emphasis in Faherty)).

The Court recognizes that Dr. Kosmicki, as a chiropractor, is not considered an "acceptable medical source" under the Regulations. However, SSR 06-3p specifically provides that the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (i.e., the length, frequency, and extent of the treating relationship; the extent to which the provider's opinion is supported by the record; and the provider's degree of specialization) can be applied to opinion evidence from "other sources". SSR 06-3p goes on note that opinions from other sources, such as chiropractors, "are important and should be evaluated on key issues such as impairment severity and functional effects." Furthermore, "it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." Id.

Here, Dr. Kosmicki had seen Plaintiff more frequently, and provided more supporting detail in his reports, than Dr. Maxwell, whose opinion the ALJ accorded greater weight. Dr. Maxwell apparently examined Plaintiff only once during the relevant period, on November 8, 2008. At Plaintiff's other visits to Dr. Maxwell's office, it appears that Plaintiff only saw his assistant, NP Maxwell, who is not an "acceptable medical source." <u>See</u> 20 C.F.R. §§ 404.1527(a)(2), 404.1513(a). Furthermore, unlike Dr. Kosmicki, Dr. Maxwell did not provide functional limitations such as the duration that Plaintiff would be able to sit or stand during an 8-hour work-day, or the amount of weight Plaintiff could lift. He also did not define the term "light work", which he apparently was using in connection with Plaintiff's concurrent claim for Workers' Compensation benefits.

The ALJ also erroneously accorded greater weight to consultative examiner Dr. Boehlert, who opined that Plaintiff's condition was not chronic, continuous, or permanent. That opinion has proven incorrect, as Plaintiff has since been found disabled for the period commencing the day after the ALJ's initial adverse decision. Furthermore, in comparison to Dr. Kosmicki's detailed and specific limitations, Dr. Boehlert described Plaintiff's limitations in general and speculative terms (i.e., "'moderate' limitation to any use of the left arm for heavy exertion"; and a "'moderate' limitation to neck rotation on a repetitive or

continuous basis which could resolve in six to nine months"). While the opinions of treating or consulting physicians need not be reduced to any particular formula, the consultative examiner's use of the term "moderate", without additional information, does not permit the ALJ, a layperson notwithstanding his "considerable and constant exposure to medical evidence, to make the necessary inference that [Plaintiff] can perform the exertional requirements", Hilsdorf, 724 F. Supp.2d at 347-48, of light work. See also Faherty, 2013 WL 1290953, at *14 (finding that ALJ erred in Furthermore, the ALJ gave significant weight to consultative examiner even though she acknowledged that his medical source statement did not contain the terminology used in the regulations).

B.   **The Assessment Of Plaintiff's Credibility**

The ALJ here found that although Plaintiff had medically determinable impairments that reasonably could be expected to produce the alleged symptoms, his testimony concerning the intensity, persistence, and limiting effects of his pain and the side-effects of his medications were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." The Court has found no support in the regulations or the caselaw from this Circuit supporting the propriety of basing a credibility determination solely upon whether the ALJ deems the claimant's allegations to be congruent with the ALJ's own RFC finding. See, e.g., Smollins v. Astrue, No. 11-CV-424, 2011 WL

3857123, at *11 (E.D.N.Y. Sept. 1, 2011) ("[The ALJ's] analysis of Smollins's credibility is flawed not only in its brevity, but also in its acceptance as a foregone conclusion of Smollins's capacity to perform sedentary work. Instead of comparing Smollins's symptoms, as described by Smollins herself and her doctors, to the objective medical and other evidence of record as required by the Social Security regulations, [the ALJ] merely compared Smollins's statements regarding her symptoms to his own RFC assessment."); see also Mantovani v. Astrue, No. 09-CV-3957, 2011 WL 1304148, at *5 (E.D.N.Y. Mar. 31, 2011) (similar).

"The assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence and limiting effects of her symptoms." Otero v. Colvin, 12-CV-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013). Id. Thus, it is not logical to decide a claimant's RFC prior to assessing his credibility. To use that RFC to discredit the claimant's subjective complaints merely compounds the error. Id.; cf. Faherty v. Astrue, No. 11-CV-02476 (DLI), 2013 WL 1290953, *14 (E.D.N.Y. Mar. 28, 2013) ("The ALJ explained the reason for giving Dr. Tranese's medical source statement significant weight was that it was consistent with her RFC. Such reasoning is circular and flawed. The ALJ should use medical opinions to determine Plaintiff's RFC, and, therefore, cannot give medical opinions weight based on their consistency with the RFC.")

(internal citation to record omitted). Indeed, the Seventh Circuit has specifically rejected the boilerplate language used by this ALJ noting that it "implies that ability to work is determined first and is then used to determine the claimant's credibility." Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012).

The ALJ omitted the conclusions of several medical sources that supported Plaintiff's credibility and omitted any mention of Plaintiff's prescription regimen and the individual and combined side effects of his medications, "raising doubt as to whether the entire record was considered as required by SSR 96-7P and 20 C.F.R. § 404.1529." Hall v. Astrue, 677 F. Supp.2d 617, 632 (W.D.N.Y. 2009) (remanding case so that ALJ could adequately discuss the factors of SSR 96-7P and clearly set out the reasons why (or why not) Plaintiff is not entitled to full credibility; the ALJ had omitted the conclusions of several medical sources that supported plaintiff's subjective complaints and had omitted any mention of plaintiff's medications).

### C.  The Incomplete Hypothetical

At step 5, the burden is on the Commissioner to prove that "there is other gainful work in the national economy which the claimant could perform." Balsamo v. Chater, 142 F.3d 75 (2d Cir. 1998). The ALJ properly may rely on an outside expert, but there must be "substantial record evidence to support the assumption upon which the vocational expert based his opinion." Dumas v. Schweiker,

712 F.2d 1545, 1554 (2d Cir. 1983). A VE's opinion in response to an incomplete hypothetical question cannot provide substantial evidence to support a denial of disability. See DeLeon v. Secretary of Health and Human Servs., 734 F.2d. 930, 936 (2d Cir. 1984) (finding that, as a result of the ALJ's failure to present the full extent of the claimant's physical disabilities, the record provided no basis for drawing conclusions about whether the claimant's impairments rendered him disabled). Whether the ALJ's hypothetical was incomplete depends on whether he properly weighed Dr. Kosmicki's May 5th opinion and correctly accounted for all of Plaintiff's limitations in the RFC assessment. As discussed above, the Court finds that the RFC assessment did not account for the full spectrum of Plaintiff's limitations. Necessarily, the ALJ's hypotheticals based on that RFC assessment were incomplete. "If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." Pardee v. Astrue, 631 F. Supp.2d 200, 211 (N.D.N.Y. 2009) (citation omitted).

## V.    Remedy

When a reviewing court concludes that incorrect legal standards have been applied or that substantial evidence does not support the Commissioner's determination, it should be reversed. 42 U.S.C. § 405(g). A reviewing court has the authority to reverse

with or without remand. 42 U.S.C. §§ 405(g), 1383(c)(3). Reversal without remand, although atypical, is appropriate where, as here, there is "persuasive proof of disability" in the record and further proceedings would be of no use. <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980). As discussed, the ALJ committed legal errors throughout the sequential evaluation. Had the ALJ not committed these errors, a finding of disability was compelled based upon the record considered as a whole. Accordingly, remand solely for calculation of benefits is warranted. <u>See</u> <u>Carroll v. Secretary of Health & Human Servs.</u>, 705 F.2d 638, 644 (2d Cir. 1983)(reversal without remand for additional evidence particularly appropriate where payment of benefits already delayed for four years).

## VII. Conclusion

For the reasons discussed above, Defendant's motion for judgment on the pleadings is denied, and the Commissioner's decision denying benefits is reversed. Plaintiff's motion for judgment on the pleadings is granted, and the matter is remanded solely for calculation and payment of benefits for the period from November 4, 2008, to August 26, 2010. The Clerk of the Court is requested to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    April 21, 2014
          Rochester, New York